**Joseph Sansone**
**Lindsay S. Moilanen**
**David Bennett**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street**
**Suite 20-100**
**New York, NY 10004-2616**
**212-336-1021 (Moilanen)**
**moilanenl@sec.gov**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                                            **Plaintiff,**<br><br>            **-against-**<br><br>**JUSTIN CHEN and**<br>**JUN ZHEN,**<br><br>                                            **Defendants.** | **COMPLAINT**<br><br>**25 Civ. _____ (      )**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Justin Chen ("Chen") and Jun Zhen ("Zhen") (collectively, "Defendants"), alleges as

follows:

**SUMMARY**

1.        From at least January 2025 to June 2025 (the "Relevant Period"), Chen and Zhen,

then employees of EdgarAgents LLC ("EdgarAgents"), engaged in a brazen insider trading

scheme, unlawfully trading in stocks of multiple companies that used EdgarAgents to assist them

with making public filings in the Commission's Electronic Data Gathering, Analysis, and

Retrieval ("EDGAR") system.

2.      As employees at EdgarAgents, Defendants regularly had access to nonpublic information about EdgarAgents's clients through a shared EdgarAgents email account to which clients sent filings to process (the "Inbound Email Account").

3.      This nonpublic information in the filings included significant company announcements related to important events including mergers and earnings results.

4.      As employees of EdgarAgents, Chen and Zhen were required to keep client information confidential and were prohibited from engaging in insider trading.

5.      On at least thirteen occasions during the Relevant Period, Chen and Zhen obtained material nonpublic information ("MNPI") from the Inbound Email Account and traded on that information. Through this trading, Chen and Zhen together obtained ill-gotten profits of more than $2.2 million.

6.      After profiting from this scheme, Chen and Zhen attempted to leave the country. but were arrested before fleeing for conduct relating to the allegations herein.

## VIOLATIONS

7.      By virtue of the foregoing conduct and as alleged further herein, Defendants Chen and Zhen have violated Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b); 78n(e)], and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5; 240.14e-3].

8.      Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

9.      The Commission brings this action pursuant to the authority conferred upon it by

Exchange Act Sections 21(d) and 21A(a) [15 U.S.C. §§ 78u(d); 78u-1(a)].

10.     The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Exchange Act Section 21(A) [15 U.S.C. § 78u-1]; and (d) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Exchange Act Sections 21, 21A, and 27 [15 U.S.C. §§ 78u; 78u-1; 78aa].

12.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

13.     Venue lies in this District under Exchange Act Section 27 [15 U.S.C. § 78aa]. Defendants may be found in and are inhabitants of the Eastern District of New York, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including the Defendants placing many of the trades described herein.

## DEFENDANTS

14.     **Chen**, age 31, resides in Brooklyn, New York. Chen worked at EdgarAgents from July 9, 2020 to June 29, 2025 as an EDGAR Assistant Manager, helping track and process client requests. Chen was terminated from EdgarAgents in connection with the conduct described herein.

15.     **Zhen**, age 29, resides in Brooklyn, New York. Zhen worked at EdgarAgents from March 4, 2021 to June 29, 2025 as a Typeset Assistant Manager, dealing with EDGAR filings that required "typeset" formatting. Zhen was terminated from EdgarAgents in connection with the conduct described herein.

## OTHER RELEVANT ENTITY

16.     **EdgarAgents** is headquartered in New York, New York. It is a full-service EDGAR filing agent. Annually, it processes over 40,000 SEC filings in the EDGAR system.

## FACTS

### I.     BACKGROUND

#### A.     EDGAR and EdgarAgents, Generally

17.     Pursuant to the federal securities laws, public and other companies are required to make certain, regular disclosures.

18.     These disclosures may include Forms 10-K (annual reports of companies' financial performance) and Forms 10-Q (quarterly reports of company's performance during a certain period).

19.     These disclosures may also include current reports on Forms 8-K, which are used to timely notify shareholders of certain events that may be important to them that fall outside of periodic reporting windows.

20.     EDGAR is the primary system that companies and others filing documents use to make filings required under the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, and the Investment Company Act of 1940, including Forms 10-K, Forms 10-Q, and Forms 8-K.

21.     The EDGAR system processes about 4,700 filings per day.

22.     EdgarAgents, and other companies providing similar services, help companies make filings on EDGAR.

23.     These companies, commonly referred to as "filing agents," typically can assist with the technical process of making filings on EDGAR, as well as, if necessary converting documents into the proper format for EDGAR, adding machine-readable tags to filings (called inline XBRL tagging), typesetting, and printing of shareholder communications.

**B.     Through Their Work at EdgarAgents, Defendants Had Regular Access to MNPI about Publicly-Traded Companies**

24.     EdgarAgents maintained the Inbound Email Account to track and process filings for clients.

25.     During the Relevant Period, all managers and assistant managers (including Chen and Zhen) had access to all inbound requests from clients submitted to the Inbound Email Account.

26.     Many client requests related to processing Forms 8-K.

27.     As part of their jobs at EdgarAgents, Chen and Zhen were tasked with opening the submitted requests from the Inbound Email Account, understanding the nature of the inbound job from the client, and forwarding the message to the appropriate member of EdgarAgents' offshore production team.

28.     The offshore production team would then do any required conversion and send the draft filing back to the U.S.-based team (including Chen and Zhen), who would review it before sending it back to the client for approval.

29.     During the Relevant Period, about 30 EdgarAgents employees, including Chen and Zhen, used an internal EdgarAgents instant message group ("Inbox Chat") to exchange messages about the status of requests received in the Inbound Email Account.

30.     These Inbox Chat messages covered the status of multiple filings and client requests, and generally listed the client name and filing type (*e.g.*, Form 8-K) that were in process on any given day.

31.     Through their roles and access to the Inbound Email Account, Defendants obtained nonpublic information directly from issuers of securities that were clients of EdgarAgents.

32.     Chen and Zhen were both remote employees and could work from home or while traveling abroad.

### C.     EdgarAgents' Policies Prohibited Defendants from Disclosing or Trading on Nonpublic Information Obtained Through Their Employment

33.     During the Relevant Period, Chen and Zhen were subject to policies and procedures laid out in EdgarAgents' employee handbook. These policies and procedures included requirements to keep client information confidential and prohibitions on insider trading.

34.     The employee handbook in place from March 12, 2024 through May 19, 2025 included the following language:

> The Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. All employees agree to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out the work for the Company consistent with the Company's agreement with such third party.

35.     The handbook was updated on May 20, 2025 and continued to include the above language.

36.     The May 20, 2025 handbook added the following language on insider trading:

> Insider trading is strictly prohibited at EdgarAgents and is a violation of both company policy and federal securities laws. Insider trading involves the buying or selling of EdgarAgents clientele's securities based on material, nonpublic information that could influence an investor's decision to buy or sell. Employees, officers, directors, consultants,

and affiliates of EdgarAgents must not use confidential information provided to us by our clientele—whether related to their company or its partners—for personal gain or to benefit others. This prohibition extends to anyone who has access to such insider information, including family members, friends, or any individuals who may use this information to trade. Material, nonpublic information includes any facts that could impact an investor's decision, such as earnings, mergers or acquisitions, or leadership changes. Employees are also prohibited from sharing this nonpublic information with others (known as 'tipping'). Violations of this policy can lead to severe legal consequences, including civil and criminal penalties, fines, and possible imprisonment, as well as internal disciplinary action, including termination of employment.

37.    Additionally, as part of their employment, Chen and Zhen were required to execute an agreement to not use any client information for personal gain.

38.    Chen and Zhen both executed this agreement acknowledging they could not use client information for personal gain in January and March 2021, respectively.

## II.    DEFENDANTS MISAPPROPRIATED NONPUBLIC INFORMATION FROM EDGARAGENTS AND USED IT TO TRADE STOCKS

### A.    Defendants' Trading, Generally

39.    During the Relevant Period, on at least thirteen occasions, Chen and Zhen each traded in the stocks of clients of EdgarAgents based on MNPI obtained through the Inbound Email Account.

40.    Chen and Zhen each had a retail brokerage account in which they conducted trading.

41.    Chen opened his brokerage account (the "Chen Brokerage Account") in or around May 2018.

42.    Zhen opened his brokerage account (the "Zhen Brokerage Account") in February 2025.

43.    Chen and Zhen also traded through at least one Hong Kong-based brokerage account ("Hong Kong Account").

44.    The Hong Kong Account was opened in January 2025 in the name of Chen's

sister-in-law, a Chinese citizen.

45.     According to chats between them, Chen and Zhen planned to keep the trading profits in the Hong Kong Account less a 6% "fee" that went to Chen's sister-in-law.

46.     During the Relevant Period, Chen and Zhen routinely reviewed messages sent to the Inbound Email Account to identify filings that contained MNPI.

47.     Chen and Zhen regularly discussed their insider trading scheme using an encrypted messaging app.

48.     Specifically, Chen and Zhen regularly discussed the content of filings, when the filings would be publicly disclosed, the potential impact of the filings on the price of the relevant securities, and their trading around the filings.

49.     On May 21, 2025, Chen wrote to Zhen, in reference to their scheme: "our business is proven to work and it is stable…just treat this [] like a business…u can make 1mil."

50.     Chen and Zhen referred to EdgarAgents' clients' filings as "skins." For example, on June 14, 2025, Chen messaged Zhen: "[l]ook out for skins [o]ver the weekend."

51.     Chen and Zhen placed each of their unlawful trades on the basis of MNPI they obtained about forthcoming filings by EdgarAgents' clients that they anticipated would cause the client's stock price to increase.

52.     In placing each of these trades, Chen and Zhen knew or at least recklessly disregarded that they were trading based on information that was material and nonpublic and that using the information to enrich themselves through trading was a breach of their duties as EdgarAgents employees.

53.     Four examples of Chen's and Zhen's trading scheme are detailed in paragraphs 54-128 below.

**B.     March 2025 Trading in Ondas**

54.     Ondas Holdings, Inc. ("Ondas") is a Massachusetts-based provider of private wireless data solutions and commercial drone solutions. Ondas common stock is listed on the NASDAQ exchange where it trades under the ticker symbol "ONDS."

55.     On March 11, 2025, before the market opened, Ondas filed a Form 8-K attaching a press release announcing that Ondas had entered into a strategic partnership with Palantir Technologies Inc. (the "Ondas Announcement").

56.     On March 10, 2025 at 2:57 p.m., an attorney for Ondas sent a copy of the Form 8-K containing the Ondas Announcement to the Inbound Email Account at EdgarAgents.

57.     Chen and Zhen had access to the Inbound Email Account on that day.

58.     In the afternoon on March 10, 2025, Chen purchased 65,239 Ondas shares in the Chen Brokerage Account for approximately $44,703.

59.     In the afternoon of March 10, 2025, Zhen purchased 38,747 Ondas shares in the Zhen Brokerage Account for approximately $27,896.

60.     Also in the afternoon of March 10, 2025, the Hong Kong Account purchased 28,770 Ondas shares for approximately $19,724.

61.     The Ondas Announcement was issued at 8:30 a.m. on March 11, 2025. Shortly thereafter, EdgarAgents filed the Form 8-K containing the Ondas Announcement on Ondas's behalf.

62.     Approximately fifteen minutes after the Ondas Announcement, on the morning of March 11, 2025, Chen began selling his entire position of Ondas shares (65,239 shares) for approximately $69,447, resulting in a profit of approximately $24,757.

63.     At approximately the same time, the Hong Kong Account sold its entire position

for approximately $30,209, resulting in a profit of approximately $10,484.

64.    On the morning of March 11, 2025, approximately one hour and ten minutes after the Ondas Announcement, Zhen sold his entire position in Ondas shares (38,747 shares) for approximately $39,901, resulting in a profit of approximately $12,013.

65.    The day before the Ondas Announcement, on March 10, 2025, Ondas shares closed at $0.72 per share. Following the Ondas Announcement, on March 11, 2025, Ondas shares opened at $1.18 per share (an increase of approximately 63%).

66.    Before March 10, 2025, neither Chen nor Zhen had bought Ondas shares.

67.    On March 30, 2025, shortly after this trading, Zhen conducted the following internet searches: "insider trading"; "how does finra confirm insider trading"; "what do I need to make a offshore brokerage account"; "is finra able to investigate offshore brokerage firms"; "how does the sec regulate 3rd party trading".[1]

**C.    May 2025 Trading in Purple**

68.    Purple Innovation, Inc. ("Purple") is a Utah-based creator of mattresses and pillows. Purple's common stock is listed on the NASDAQ exchange where it trades under the ticker symbol "PRPL."

69.    On May 6, 2025, after the market closed, Purple filed a Form 8-K attaching a press release announcing that Purple had entered into a partnership with Somnigroup International, Inc. to expand Purple's product offerings in Somnigroup's stores nationwide as well as announcing it entered into a strategic supply agreement with Tempur Sherwood, LLC, a subsidiary of Tempur Sealy, to assemble Purple products (together, the "Purple Announcement").

---

[1]    "finra" refers to the Financial Industry Regulatory Authority, a self-regulatory body for the securities industry.

70.     Additionally, on the same day shortly after the Purple Announcement, Purple also released its financial results for the quarter ended March 31, 2025.

71.     On May 5, 2025, around 3:50 p.m., an attorney for Purple sent a copy of the Form 8-K containing the Purple Announcement and the Form 8-K containing its financial results to the Inbound Email Account at EdgarAgents.

72.     Chen and Zhen had access to the Inbound Email Account on that day.

73.     In addition, Chen and Zhen received Inbox Chat messages related to the Purple Announcement and Form 8-K.

74.     In the evening on May 5, 2025 and the morning of May 6, 2025, before the Purple Announcement, Chen purchased 117,799 Purple shares through his brokerage account for approximately $90,135.

75.     In the evening on May 5, 2025, Zhen purchased 41,000 Purple shares through his brokerage account for approximately $29,936.

76.     In the evening of May 5, 2025, the Hong Kong Account purchased 70,763 Purple shares for approximately $49,960.

77.     Starting at 7:11 a.m. on May 6, 2025, Chen and Zhen exchanged the following encrypted messages about Purple:

> Zhen: I hope purple releases their shit at like 9
> Chen: Really hard to say
> Chen: I look at their old shit
> Chen: Everything is in the afternoon
> […]
> Zhen: U loading up more?
> Chen: Ya I bought more skins
> […]
> Zhen: Im all in this purple skim atm

78.     Later, starting at 9:35 a.m. on May 6, 2025, Chen and Zhen exchanged the

following encrypted messages about Purple:

> Zhen: Might shoot the f[***] up
> Zhen: Even with the earnings
> Chen: It has to
> Chen: It has to
> Chen: It's too big
> Zhen: Cuz the skin talks about their future plans
> Chen: At least I think it's big
> Zhen: Same

79.     Chen and Zhen exchanged numerous additional encrypted messages throughout the day tracking the stock price and anticipating the timing of the Purple Announcement.

80.     The Purple Announcement was issued at 4:00 p.m. on May 6, 2025. Shortly thereafter, EdgarAgents filed the related Form 8-K.

81.     Chen began selling his Purple shares approximately two minutes after the Purple Announcement in the afternoon on May 6, 2025. In total, Chen sold his entire Purple position (117,799 shares) about five minutes after the announcement for approximately $120,413, resulting in a profit of approximately $30,301.

82.     The Hong Kong Account began selling its position approximately three minutes after the Purple Announcement, selling 70,694 Purple shares for approximately $72,783, resulting in a profit of approximately $22,874.

83.     Zhen sold his Purple shares about 12 minutes after the announcement in the afternoon on May 6, 2025. Zhen sold 41,000 Purple shares for approximately $40,191, resulting in a profit of approximately $10,263.

84.     On May 6, 2025, before the Purple Announcement, Purple shares closed at $0.74 per share. The next morning, on May 7, 2025, Purple shares opened at $0.85 per share (an increase of approximately 15%) and hit a high price of $0.97 per share.

85.     Before May 5, 2025, neither Chen nor Zhen had bought Purple shares.

### D.    May 2025 Trading in SigmaTron

86.     SigmaTron International, Inc. ("SigmaTron") is an Illinois-based provider of electronic manufacturing services including printed circuit board assemblies, electro-mechanical subassemblies and completely assembled (box-build) electronic products. SigmaTron common stock is listed on the NASDAQ exchange where it trades under the ticker symbol SGMA.

87.     On May 21, 2025, before the market opened, SigmaTron filed a Form 8-K attaching a press release announcing that SigmaTron had entered into a merger agreement whereby SigmaTron would be acquired by Transom Capital Group, LLC ("Transom") at a total enterprise value of approximately $83 million representing a price premium of approximately 134% over SigmaTron's closing price per share on May 20, 2025 (the "SigmaTron Announcement").

88.     The SigmaTron Announcement stated that the acquisition would be done via a tender offer.

89.     Prior to May 20, 2025, Transom Capital took substantial steps to commence or did commence a tender offer for SigmaTron's shares of stock but the tender offer was not publicly announced during this time.

90.     At 3:17 p.m. on May 20, 2025, an attorney for SigmaTron sent the EdgarAgents Inbound Email Account an email with the subject "RE: Edgar Agents – Upcoming IPO / Merger Deals" that indicated that they would be sending a Form 8-K and merger agreement for "a potential filing pre-market tomorrow morning."

91.     At 10:29 p.m. on May 20, 2025, an attorney for SigmaTron sent the EdgarAgents Inbound Email Account an email with the SigmaTron Form 8-K, the merger agreement, and the press release describing the transaction.

92.     According to the press release submitted by SigmaTron, Transom would acquire SigmaTron for $83 million.

93.     Starting around 3:30 p.m., Chen and Zhen had the following exchange using encrypted messages:

> Chen: Cuz I know this merger is gonna be big
> Chen: It's a merger ipo
> […]
> Chen: I just hope they send both company name
> Zhen: They said sigmatron international
> Chen: Ya I know that
> Chen: I want to know who is the acquiring one
> […]
> Chen: I think it will be big
> […]
> Chen: U have to understand
> Chen: What is a merger ipo
> […]
> Chen: It will go up regardless
> Chen: It don't matter what industry
> […]
> Chen: I can assure u, that it won't go down
> […]
> Chen: Trust me
> Chen: It's gonna be good
> […]
> Chen: Loading up
> […]
> Zhen: Gonna load up the hk acc too then

94.     At 8:32 p.m., Chen sent Zhen exchanged the following encrypted messages:

> Chen: I'm selling at market open
> […]
> Chen: I see u in china if it goes to 20
> Zhen: Gotta get my house done
> Zhen: Prob get a more expensive house
> […]
> Chen: Better capitalize this year and just retire

95.     At 11:39 p.m., Zhen sent Chen an encrypted message stating that SigmaTron had submitted the filing.

96.    Ten minutes later, Zhen sent Chen a series of encrypted messages describing how the SigmaTron transaction would work.

97.    Starting at 1:21 a.m. on May 21, 2025, Zhen and Chen had the following exchange using encrypted messages:

> Zhen: I still think its gonna a be pretty damn good
> Zhen: I googled it
> Chen: What u get
> Zhen: If private company acq a public
> Zhen: Price will rise
> Chen: Ya
> Chen: Cuz it's merger
> Chen: They getting money
> Zhen: 83 million i think

98.    In the afternoon and evening on May 20, 2025, Chen purchased 144,870 SigmaTron shares through his brokerage account for approximately $193,034.

99.    In the afternoon on May 20, 2025, and early in the morning on May 21, 2025, Zhen purchased 41,405 SigmaTron shares in his brokerage account for approximately $51,494.[2]

100.    Starting at 4:08 a.m. on May 21, 2025, the Hong Kong Account purchased 67,516 SigmaTron shares for approximately $102,156.

101.    On May 21, 2025, at 8:30 a.m., the SigmaTron Announcement was issued. Shortly thereafter, EdgarAgents filed the related Form 8-K on SigmaTron's behalf.

102.    Starting at 8:31 a.m., the Hong Kong Account sold 67,516 SigmaTron shares for approximately $197,237, resulting in a profit of approximately $95,081.

103.    Chen sold his SigmaTron shares on May 21, 2025, approximately a half-hour after the SigmaTron Announcement. In total, Chen sold 144,870 SigmaTron shares for

---

[2]    On May 20, 2025, Zhen also sold 4,500 SGMA shares. At the time of the SigmaTron Announcement, Zhen owned 36,905 SGMA shares.

approximately $419,245, resulting in a profit of approximately $226,226.

104.    Approximately a half-hour after the announcement, Zhen sold his SigmaTron position. Zhen sold 36,905 SigmaTron shares for approximately $108,721, resulting in a profit of approximately $63,802.[3]

105.    On May 20, 2025, SigmaTron closed at $1.29 per share. On May 21, 2025, after the SigmaTron Announcement, SigmaTron opened at $2.93 per share (an increase of approximately 127%) and closed at $2.97 per share.

106.    Before May 20, 2025, neither Chen nor Zhen had bought SigmaTron shares.

**E.    May 2025 Trading in Signing Day**

107.    Signing Day Sports, Inc. ("Signing Day") is an Arizona-based developer of an electronic app used by student-athletes to create recruitment profiles for college sports. Signing Day common stock is listed on the NASDAQ exchange where it trades under the ticker symbol "SGN."

108.    On May 28, 2025, before the market opened, Signing Day filed a Form 8-K attaching a press release announcing that Signing Day had entered into a merger agreement with BlockchAIn Digital Infrastructure, a digital asset mining and data hosting company that is developing new facilities (the "Signing Day Announcement").[4]

109.    On May 21, 2025 at 9:40 p.m., an attorney for Signing Day sent a copy of the Form 8-K containing the Signing Day Announcement to the Inbound Email Account at EdgarAgents. At that time, Chen and Zhen did not know when Signing Day would make the filing.

---

[3]    Zhen's profit includes his profit from selling 4,500 SGMA shares on May 20, 2025 before the SigmaTron Announcement.

[4]    The markets were closed from May 24, 2025 through May 26, 2025 for the Memorial Day holiday.

110.    Chen and Zhen had access to the Inbound Email Account on May 21, 2025.

111.    On May 21, 2025, Chen messaged Zhen: "I have [mad] confidence in sgn to be honest…This [] is mad volatile…Look into sgn…low float And the skin is pretty good too."

112.    On May 22, 2025, Chen again messaged Zhen: "I'm mad confident in sgn…If u read the skin It is actually very good."

113.    From May 22 to May 28, 2025, Zhen searched Google for "sgn stock" on at least five occasions.

114.    In text messages between Chen and Zhen on the morning of May 27 2025, Chen indicated that the filing said: "the shareholders get pay base [sic] off the current day of the share price."

115.    Chen and Zhen traded in and out of Signing Day shares over a number of days after EdgarAgents received the Signing Day Announcement.

116.    Between May 22, 2025 and the morning of May 27, 2025, Chen made a profit of approximately $70,948 on these trades and Zhen made a profit of approximately $26,259 on these trades. After this trading activity, Chen and Zhen did not hold any shares of Signing Day.

117.    At 2:45 p.m. on May 27, 2025, Chen sent Zhen the following messages on the encrypted messaging app:

>    Chen: Yo
>    Chen: Sgn
>    Chen: Just came in
>    Chen: It's time

118.    At 2:49 p.m., Chen called Zhen for approximately two minutes.

119.    Starting at 2:51 p.m., Zhen purchased 130,000 Signing Day shares through his brokerage account for approximately $97,267.

120.    Starting at 3:21 p.m., the Hong Kong Account purchased 310,001 Signing Day

shares for approximately $246,894.

121.     Starting at 3:29 p.m., Chen purchased 128,517 Signing Day shares through his brokerage account for approximately $100,007.

122.     The Signing Day Announcement was issued on May 28, 2025 at 8:45 a.m. Shortly thereafter, EdgarAgents filed the related Form 8-K.

123.     The Hong Kong Account began selling its Signing Day shares approximately 18 minutes after the Signing Day Announcement. In total the Hong Kong Account sold 310,001 Signing Day shares for approximately $975,342, for a total profit of approximately $728,448.

124.     Chen sold his Signing Day shares approximately 50 minutes after the Signing Day Announcement. In total, Chen sold 128,517 Signing Day shares for approximately $395,939 for a total profit of approximately $295,953.

125.     In the morning, on May 28, 2025, approximately 50 minutes after the announcement, Zhen sold his entire stake in Signing Day (130,000 Signing Day shares) for approximately $420,732, yielding a profit of approximately $323,486.

126.     On May 27, 2025, the day before the announcement, Signing Day closed at $0.83 per share.

127.     On May 28, 2025, after the announcement, Signing Day opened at $3.17 per share (an increase of approximately 282%) and closed at $2.19 per share.

128.     Before May 22, 2025, neither Chen nor Zhen had bought Signing Day shares.

**F.     Chen and Zhen Traded on Nine Additional Occasions Based on MNPI Obtained about EdgarAgents' Clients**

129.     The below chart reflects other instances in which Chen and Zhen engaged in a similar pattern of trading, as well as their total ill-gotten profits from the trading scheme.

| Security | Filing Date | Substance of Filing | Chen Brokerage Account Profits | Zhen Brokerage Account Profits | Hong Kong Account Profits |
|---|---|---|---|---|---|
| Triller Group, Inc. (ticker: ILLR) | 1/29/25 | Triller announced a private placement offering of an aggregate of $14 million | $2,700 | n/a | $468 |
| ARB OIT Group Limited (ticker: ARBB) | 3/4/25 | ARB OIT announced an artificial intelligence ("AI") products supply agreement valued at $45 million | $50,896 | $12,111 | $14,244 |
| Ondas[5] | 3/11/25 | *see above* | $24,757 | $12,013 | $10,484 |
| ARBB | 4/14/25 | ARB OIT announced that it had entered into a contract to deliver AI data server solutions valued at approximately $53 million | $66,145 | $19,093 | n/a |
| Purple | 5/6/25 | *see above* | $30,301 | $10,263 | $22,874 |
| Asset Entities Inc. (ticker: ASST) | 5/7/25 | Asset Entities announced that it would merge with Strive Asset Management to form the first publicly traded asset management bitcoin treasury company | n/a | $4,285 | $13,532 |
| Rumble Inc. (ticker: RUM) | 5/8/25 | Rumble announced its financial results for the fiscal quarter ended March 31, 2025 | $10,535 | $315 | $5,247 |
| Gryphon Digital Mining Inc. | 5/12 and 5/13/25 | Gryphon and American Bitcoin | n/a | not profitable | $115,586 |

---

[5]      The shaded rows represent the four trading events described earlier in this section. They are included here for completeness.

| Security | Filing Date | Substance of Filing | Chen Brokerage Account Profits | Zhen Brokerage Account Profits | Hong Kong Account Profits |
|---|---|---|---|---|---|
| (ticker: GRYP) | | entered into a merger agreement | | | |
| SigmaTron | 5/21/25 | *see above* | $226,226 | $63,802 | $95,081 |
| Signing Day | 5/28/25 | *see above* | $295,953 | $323,486 | $728,448 |
| NewGenIVF Group Limited (ticker: NIVF) | 6/2/25 | NewGenIVF announced its plans to invest $30 million in staking the digital asset Solana | $15,334 | $45,733 | $81,862 |
| Getty Images Holdings, Inc. (ticker: GETY) | 6/10/25 | Shutterstock, Inc. (ticker: SSTK; an EdgarAgents client) announced that its stockholders approved the adoption of the merger agreement between Shutterstock and Getty | $6,201 | $6,317 | $6,498 |
| Polyrizon Ltd. (ticker: PLRZ) | 6/12/25 | Polyrizon announced encouraging preclinical results from a study evaluating its proprietary platform | $5,070 | $3,201 | not profitable |
| **TOTAL PROFITS** | | | **$734,118** | **$500,619** | **$1,094,324** |

## III.    CHEN AND ZHEN PLANNED TO LEAVE THE COUNTRY

130.    On May 21, 2025, Chen messaged Zhen: "I am really Considering Leaving If I get over 3mil But I just need u on the inside." Zhen replied: "I think u should milk till they fire u."

131.    On May 23, 2025, Chen messaged Zhen: "I'm quitting ea Once I have 5 mil

Cash…Then we do the plan It's safer that way."

132.    On May 27, 2025, the day before the Signing Day Announcement, Chen purchased a flight from Hong Kong to New York, arriving in New York on June 20, 2025, and a return ticket only a week later from New York to Hong Kong, departing on June 28, 2025.

133.    On May 28, 2025, the day of the Signing Day Announcement, Zhen told Chen: "Month to date 400k." Chen replied: "Book your ticket today…Book single flight first…June 28th The 1 am flight Get it done now."

134.    Later that day, on May 28, 2025, Zhen purchased a one-way airline ticket from New York to Hong Kong on the same flight as Chen on June 28, 2025.

135.    In a text exchange around this time, Chen told Zhen: "we gotta get out quick."

136.    Prior to boarding that flight, Chen and Zhen were arrested.

137.    At the time of the arrest, Chen and Zhen were in possession of three Rolex watches.

**FIRST CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(Both Defendants)**

138.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 137.

139.    Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

140.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 14(e) and Rule 14e-3 thereunder
### (Both Defendants)

141.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 52, 86 through 106, and 130 through 137.

142.    Prior to May 20, 2025, Transom Capital ("offering person") took substantial steps to commence or did commence a tender offer for SigmaTron's shares of stock but the tender offer was not publicly announced during this time.

143.    Between May 20, 2025 and May 21, 2025, Defendants possessed material nonpublic information sent by SigmaTron to EdgarAgents (their employer) relating to the tender offer SigmaTron's shares; knew or had reason to know that this information was nonpublic; knew or had reason to know that this information was acquired directly or indirectly from (a) the offering person, (b) the issuer of the securities sought or to be sought by such tender offer, or (c) any officer, director, partner or employee or any other person acting on behalf of such offering person or such issuer; and purchased or sold, or caused to be purchased or sold, SigmaTron's securities.

144.    By reason of the foregoing, Defendants violated and, unless enjoined will again violate, Exchange Act Section 14(e) [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final

Judgment:

**I.**

Permanently enjoining Chen and his agents, servants, employees and attorneys and all

persons in active concert or participation with any of them from violating, directly or indirectly,

Exchange Act Sections 10(b) and 14(e) [15 U.S.C. §§ 78j(b); 78n(e)], and Rules 10b-5(b) and

14e-3 thereunder [17 C.F.R. §§ 240.10b-5(b); 240.14e-3];

**II.**

Permanently enjoining Zhen and his agents, servants, employees and attorneys and all

persons in active concert or participation with any of them from violating, directly or indirectly,

Exchange Act Sections 10(b) and 14(e) [15 U.S.C. §§ 78j(b); 78n(e)], and Rules 10b-5(b) and

14e-3 thereunder [17 C.F.R. §§ 240.10b-5(b); 240.14e-3];

**III.**

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly,

with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange

Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

**IV.**

Ordering Defendants to pay civil monetary penalties under Exchange Act Section 21A

[15 U.S.C. § 78u-1];

## V.

Granting any other and further relief this Court may deem just and proper.

## JURY DEMAND

The Commission demands a trial by jury.


Dated:  New York, New York
        August 18, 2025

                        _____/s/ Lindsay Moilanen_____

                        Joseph Sansone
                        Lindsay S. Moilanen
                        David Bennett
                        Attorneys for Plaintiff
                        SECURITIES AND EXCHANGE COMMISSION
                        New York Regional Office
                        100 Pearl Street
                        Suite 20-100
                        New York, NY 10004-2616
                        212-336-1021 (Moilanen)
                        moilanenl@sec.gov